# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### *Southern Division*

<table>
<tr><td>

NOHORA RIVERO and<br>
LEGAL AID BUREAU, INC.

    **Plaintiffs,**

**v.**

MONTGOMERY COUNTY, MARYLAND,<br>
   *et al.*,

    **Defendants.**

</td><td>

\*

\*

\*

\*      **Case No.: PWG-16-1186**

\*

\*

\*

</td></tr>
</table>

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

On August 18, 2015, Plaintiff Nohara Rivero and her colleague at Legal Aid Bureau, Inc. ("Legal Aid") conducted outreach to migrant farmworkers employed by Defendant Fruits and Vegetables by Lewis Orchard, LLC ("Lewis Orchards"), which is owned by Defendants Robert and Linda Lewis (collectively, "the Lewises").[1] When the Lewises saw Rivero and her coworker on their property, they called the Montgomery County Police Department, accusing the Legal Aid employees of trespassing. Defendant Officer Alexander Kettering responded to the call and, after mediating between the two sides, issued Trespass Notifications and ordered the Legal Aid employees to leave the property.[2] Rivero and Legal Aid allege that the Defendants violated their rights under the First Amendment and its state analogue and seek compensatory damages, declaratory and injunctive relief, and attorneys' fees. Am. Compl., ECF No. 42. Defendants

---

[1] I will refer to Robert and Linda Lewis and Lewis Orchards collectively as the "Lewis Defendants."

[2] I will refer to Officer Kettering and Montgomery County collectively as the "County Defendants."

move to dismiss the Amended Complaint in its entirety for want of jurisdiction and for failure to state a claim. Lewis Mot., ECF No. 44; Cty. Mot., ECF No. 45. The Motions are fully briefed, Lewis Mem., ECF No. 44-1; Cty. Mem., ECF No. 45-1; Pls.' Opp'n, ECF No. 48; Lewis Reply, ECF No. 49; Cty. Reply, ECF No. 50, and no hearing is necessary, Loc. R. 105.6 (D. Md.). I find that Plaintiffs have stated claims for infringement of their clearly established right to disseminate information through door-to-door canvassing and that it is plausible that the Lewises may be state actors and therefore amenable to suit; however, I also find that Plaintiffs have failed to state a state-law claim for damages. Accordingly, I will deny the Lewis Defendants' Motions to Dismiss and grant the County Defendants' Motion in part and deny it in part.

**Background**

Legal Aid's Farmworkers Program combats unfair labor practices in the agricultural industry and helps migrant and seasonal workers obtain access to public benefits. Am. Compl. ¶¶ 10–11. Oftentimes, migrant farmworkers live in onsite housing provided by their employers. *Id.* ¶ 22. As part of its Farmworkers Program, Legal Aid makes annual, afterhours visits to such migrant labor camps in Maryland and Delaware to inform workers of their rights and of available public benefits and to listen to their concerns. *Id.* ¶ 11.

This case arises out of one such site visit on August 18, 2015, when Legal Aid employee Nohora Rivero and Spencer Evans, a summer law clerk, visited Lewis Orchards, located at 19100 Peach Tree Road in Dickerson, Maryland. *Id.* ¶¶ 2, 33. Rivero and Evans hoped to speak with the farm's twelve migrant guest workers, who were legally present in the United States on H-2A visas, and who lived onsite in two separate buildings, one at 18900 Peach Tree Road and another at 19101B Peach Tree Road, the latter of which the Plaintiffs allege is not an address that appears in Montgomery County's public records. *Id.* ¶¶ 33–34. According to the Plaintiffs,

nothing differentiates the two residential buildings from the rest of the Lewis Orchards property. *Id.* ¶ 34.

At 7:00 P.M., Rivero and Evans arrived at the farm and spoke with five workers at one of the two migrant residences about potential wage-and-hour violations. *Id.* ¶¶ 35–36. Next, they headed towards the second residence but could not find it and returned to the first building to ask for directions. *Id.* ¶¶ 37–38. As Rivero spoke again with the farmworkers, the Lewises approached and inquired about the Rivero's and Evans's business on the property. *Id.* ¶ 38. Rivero and Evans disclosed that they worked for Legal Aid, prompting Linda Lewis to "fl[y] into a rage," accusing them of trespassing, and to call the police. *Id.* ¶ 39. While waiting for the police to arrive, Rivero allegedly overheard Linda Lewis speaking on a cellphone to an unknown individual and instructing the listener to " 'call everybody' for a 'big meeting' " the following day. *Id.* ¶ 46.

Officer Kettering arrived on the scene and, after speaking with the Lewises, told Rivero and Evans that they were trespassing and instructed them to leave the farm. *Id.* ¶ 40. Rivero responded that migrant workers have the right to receive visitors. *Id.* Because Legal Aid often encounters resistance from farm owners and from local police departments when trying to contact farmworkers, its staff carries copies of relevant legal authority that sets forth the organization's right to conduct outreach. *See id.* ¶¶ 28–30. Accordingly, when Officer Kettering instructed Rivero and Evans to leave the property, Rivero produced a copy of a state attorney general's opinion that purportedly affirmed Legal Aid's right to engage in such activity. *Id.* ¶ 41. But she mistakenly provided a copy of an opinion from the Virginia Attorney General, which Officer Kettering read and correctly determined had no legal force in Maryland. *Id.* Evans

found an analogous opinion from the Maryland Attorney General on his smartphone, but Officer Kettering refused to read the document. *Id.*

Instead, he issued Trespass Notifications against Rivero and Evans that prohibited them for a one-year period from entering the property at "19101 Peach Tree Road," an address parenthetically described as "Lewis Orchards." Rivero Trespass Notification Form, Cty. Mot. Ex. B., ECF No. 45-3; Evans Trespass Notification Form, Cty. Mot. Ex. B.; Am. Compl. ¶¶ 41, 43. As a factual basis for the Notifications, the forms state that Rivero and Evans had engaged in "[u]nwanted distribution of literature" on Lewis Orchards that had not been "[]authorized by [the] agent of [the] property." Rivero Trespass Notification Form; Evans Trespass Notification Form; Am. Compl. ¶ 44. Linda Lewis signed each Notification, affirming that she was the "owner or agent" of the property at issue. *Id.* The Notifications stated that failure to comply by Rivero or Evans would result in "immediate arrest" and criminal prosecution pursuant to Md. Code Ann., Crim. Law §§ 6-401 to 410. Rivero Trespass Notification Form; Evans Trespass Notification Form; Am. Compl. ¶ 45. Rivero and Evans understood the Notifications to bar them from entering Lewis Orchards in its entirety, including the migrant farmworker residences and their curtilage. *Id.* ¶ 44.

Rivero has attempted to follow up with the Lewis Orchards farmworkers over the telephone but states that they are less willing to talk with her than they were during their previous in-person interaction. *Id.* ¶ 49. Based on this observation and the "big meeting" that Rivero and Evans allegedly overheard Lewis organizing, Legal Aid believes that the Lewises have instructed their workers not to communicate with the organization. *Id.* ¶¶ 46, 48, 50.

Rivero and Legal Aid filed this lawsuit on April 20, 2016. Compl., ECF No. 1. Three days later, Montgomery County Police Department Commander David Anderson rescinded the

Trespass Notifications. Email from David Anderson, Commander, Montgomery Cty. Police Dep't, to Deborah Jeon, Legal Dir., ACLU of Md. (Apr. 23, 2016 1:52 P.M.), Cty. Mot., Ex. C, ECF No. 45-4; *Id.* ¶ 53. Notwithstanding the rescission of the Notifications, the Plaintiffs continue to pursue a § 1983 claim against Officer Kettering in his individual and official capacities (Count I), for which they seek compensatory and punitive damages as well as injunctive relief. *Id.* ¶¶ 13, 56–61, Prayer for Relief ¶¶ B, E–F. In addition, they are pursuing a tort claim against both Kettering and Montgomery County for violation of their state constitutional rights (Count II), for which they seek compensatory damages and injunctive relief. *Id.* ¶¶ 62–66, Prayer for Relief ¶¶ B, F. Finally, the Plaintiffs seek a declaratory judgment stating that the Defendants violated their rights under the First Amendment and Article 40 of the Maryland Declaration of Rights and that the Defendants cannot prevent them from visiting farmworkers living on the Lewis Orchards property.[3] *Id.* ¶¶ 67–75, Prayer for Relief ¶¶ A, C.

## Standard of Review

Defendants move to dismiss pursuant to both Fed. R. Civ. P. 12(b)(1) and 12(b)(6). "A court should grant a Rule 12(b)(1) motion 'if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law.' " *El-Amin v. Int'l Longshoremen's Ass'n Local No. 333*, No. CCB-10-3653, 2011 WL 2580630, at *2 (D. Md. June 28, 2011)

---

[3] The Plaintiffs also seek injunctive relief against the Lewises and Lewis Orchards. *Id.* Prayer for Relief ¶ D. The Amended Complaint currently only names the Lewis Defendants under the declaratory judgment claim. *See id.* ¶¶ 56–75. In order to obtain injunctive relief against the Lewises or Lewis Orchards, Plaintiffs would either need to request permission to file a second amended complaint naming the Lewis Defendants in their § 1983 and/or state-law claim or, if I grant a declaratory judgment, bring a separate action to enforce the judgment after any subsequent violation that occurs. *See* 28 U.S.C. § 2202 (authorizing "[f]urther necessary and proper relief based on a declaratory judgment or decree . . . after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment); *Powell v. McCormack*, 395 U.S. 486, 499 ("A declaratory judgement can . . . be used as a predicate to further relief, including an injunction." (citing 28 U.S.C. § 2202)).

(quoting *Evans v. B.F. Perkins, Co.*, 166 F.3d 642, 647 (4th Cir. 1999)). "A Rule 12(b)(1) motion to dismiss is not limited to challenges to jurisdiction appearing from the face of the complaint. In considering the allegations, the court may consider extrinsic evidence and, if such evidence is disputed, may weigh and determine the facts." *United States ex rel. Ackley v. Int'l Bus. Mach. Corp.*, 76 F. Supp. 2d 654, 659 (D. Md. 1999). Courts "regard the pleadings' allegations as mere evidence on the issue," and may consider additional evidence. *Richmond, Fredericksburg & Potomac Ry. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991). Notably, if "'a defendant proffers evidence that calls the court's jurisdiction into question,'" then "no presumption of truthfulness attaches to the plaintiff's allegations." *Ackley*, 76 F. Supp. 2d at 659 (quoting *Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n*, 149 F.3d 679, 685 (7th Cir. 1998)). When a defendant challenges subject matter jurisdiction, the burden is on the plaintiff to prove that subject matter jurisdiction exists. *See Evans*, 166 F.3d at 647; *El-Amin*, 2011 WL 2580630, at *2.

Pursuant to Fed. R. Civ. P. 12(b)(6), the Amended Complaint is subject to dismissal if it "fail[s] to state a claim upon which relief can be granted." A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), and must state "a plausible claim for relief," *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Rule 12(b)(6)'s purpose "is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Velencia v. Drezhlo*, No. RDB-12-237, 2012 WL 6562764, at *4 (D. Md. Dec. 13, 2012) (quoting *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006)).

**Discussion**

Jurisdiction

Defendants argue that the Amended Complaint should be dismissed in its entirety because Commander Anderson's rescission of the Trespass Notifications mooted the Plaintiffs' claims. Lewis Mem. 6–7; Cty. Mem. 9–10, 16, 18–22. Moreover, the Montgomery County Police Department issued a Training Bulletin shortly after the Plaintiffs filed their lawsuit, which states that:

> [P]ersons providing . . . lawful services [to migrant workers] are allowed to take customary routes at customary times to the living quarters of the worker to provide these services. "Living quarters" includes but is not limited to outside areas surrounding the actual structure. . . .
>
> Officers **should not** employ the State's criminal trespass laws in an effort to remove individuals from the living quarters of migrant workers where it appears that the individuals are trying to provide lawful services to the migrants. This applies even if the owner(s) of the property on which the migrants are working seek the removal of these individuals.

Training Bulletin #16-06, at 1, Montgomery Cty., Md. Dep't of Police (May 5, 2016), Cty. Mot. Ex. D., ECF No. 45-5.

Article III restricts federal courts' jurisdiction to "cases" and "controversies." U.S. Const. art. III, § 2. "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *United States v. Hardy*, 545 F.3d 280, 283 (4th Cir. 2008) (quoting *Powell*, 395 U.S. at 496). But, if it still can be said that the plaintiff " 'suffered, or [is] threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision,' " then the plaintiff "continue[s] to have a 'personal stake in the outcome' of the lawsuit," and the case is not moot. *Wright v. Bishop*, No. DKC-12-947, 2012 WL 4324911, at *2 (D. Md. Sept.19, 2012) (quoting *Spencer v. Kemna*, 523 U.S. 1, 7 (1998), and *Lewis v. Continental Bank Corp.*, 494 U.S. 472 (1990)).

Of particular note here, "voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i.e., does not make the case moot[,]" so long as "a dispute over the legality of the challenged practices" remains. *United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953). Even so, a defendant may show that voluntary cessation renders an issue moot by "demonstrate[ing] that 'there is no reasonable expectation that the wrong will be repeated.'" *Id.* at 633 (quoting *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 448 (2d. Cir. 1945)). But, the defendant "bears [a] formidable burden" in making such a showing. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000).

Neither Commander Anderson's rescission of the Trespass Notifications nor the Police Department's issuance of a Training Bulletin that affirms Legal Aid's right to conduct outreach to migrant farmworkers over farm owners' objections moots the issues presented to the Court. Although the Training Bulletin goes a long way towards protecting Legal Aid employees' and others' rights, it only indicates that officers "should not" invoke criminal trespass laws to prevent individuals from providing lawful services to migrant workers; it does not prohibit the practice. Training Bulletin #16-06, at 1. And what the Police Department gives, it may take away. Moreover, the Bulletin fails to recognize that individuals have a First Amendment right to conduct outreach to migrant farmworkers living on their employers' property.[4] One might be tempted to dismiss this as a drafting oversight or something that the Bulletin implicitly recognizes, but the County Defendants' briefing strongly suggests otherwise. Indeed, the title of Section VI.A of their Memorandum in Support of their Motion to Dismiss emphatically declares,

---

[4] The Bulletin recognizes that migrant workers enjoy a "fundamental First Amendment right to *receive* information from those who seek to provide them with assistance," but it is silent on whether "persons providing lawful services" enjoy equivalent protections for their activities. Training Bulletin #16-06, at 1 (emphasis added).

"Plaintiffs Do Not Have a First Amendment Right to Visit Migrant Workers." Cty. Mem. 8. Based on the ephemeral nature of the Training Bulletin and the County's apparent position that the right to conduct outreach to migrant farmworkers lacks grounding in the First Amendment, I cannot say that the Defendants have carried their "formidable burden" to demonstrate that the allegedly wrongful conduct cannot "reasonably be expected to recur." *See Laidlaw*, 528 U.S. at 190.

With respect to Count III of the Amended Complaint, the County Defendants also argue that Rivero and Legal Aid lack standing to seek declaratory relief because they lack a "personal stake" in the outcome of the case and have pleaded an "abstract injury." Cty. Mem. 19. In support of this argument, they cite *Los Angeles v. Lyons*, in which the Supreme Court held that an individual who had been subjected to an illegal chokehold by a police officer lacked standing to pursue injunctive relief against a police department because he could not establish more than a speculative risk of experiencing another illegal chokehold. 461 U.S. 95, 105 (1983). According to the Court, Lyons's claim failed because he neither established any specific reason to expect that he would have another encounter with the police or suffer another illegal chokehold. *Id.* at 105–06. By contrast, Plaintiffs, who make annual visits to migrant-farmworker camps in Maryland, allege that "farm employers frequently deny access to outreach workers, such as Rivero, who try to contact farmworkers" and that "state and local police often disregard [Legal Aid's rights], siding instead with farm owners and employers." Am. Compl. ¶¶ 11, 28–30. The Amended Complaint cites reports that document this phenomenon in Maryland, as well as other states. *Id.* ¶ 31 n.4; *see also* Legal Aid Bureau, Inc., Statewide Advocacy Support Unit, Human Rights Project, *Report to U.N. Special Rapporteur on Extreme Poverty and Human Rights*, apps. C, D, & attach. 11 (2013) [hereinafter *Report to U.N.*], *available at*

https://www.wcl.american.edu/humright/center/documents/campaccess.pdf (documenting incidents in which farm owners and law enforcement prevented Legal Aid workers from conducting outreach to migrant farmworkers). Indeed, Rivero herself allegedly had a nearly factually indistinguishable encounter in Carroll County, Maryland in 2008. *Report to U.N.* app. D. And, as discussed above, the County Defendants maintain that the First Amendment does not protect Legal Aid's activities. The apparent history of conflict between Legal Aid and farm owners and law-enforcement officials in Maryland, coupled with the position taken by the County Defendants in this case persuades me that the likelihood of future controversies of a similar ilk is far from speculative or abstract. The Plaintiffs have standing to litigate the issues raised in the Amended Complaint.[5]

Moreover, contrary to what the County Defendants' argue, Cty. Mem. 9–10, 16, the Plaintiffs clearly have standing to pursue damages for the injuries they purportedly suffered as a result of the alleged constitutional violations, and it is beyond dispute that whatever steps the County has taken to prevent future infringement of constitutional rights does not remedy any injuries the Plaintiffs already have suffered from the incident at issue in this case. Although the County Defendants contest the Plaintiffs' entitlement to such damages, Cty. Mem. 4, they must make their case on the merits; the Court clearly possesses jurisdiction over the § 1983 claim and the analogous state claim.[6] On a similar note, the Lewis Defendants argue that the Court lacks

---

[5] Relatedly, the County Defendants argue that due to the rescission of the Trespass Notifications and the issuance of the Training Bulletin the potential for any future injury to Rivero or Legal Aid is speculative and abstract, making the issue not ripe for adjudication. Cty. Mem. 21–22. But for the same reasons that there is no *Lyons* standing problem, the case is also ripe for review. Am Compl. ¶¶ 11, 28–29.

[6] The County Defendants also argue that if I dismiss Counts I and III of the Amended Complaint, the Court lacks subject-matter jurisdiction over the state claim in Count II. Cty. Mem. 16. Although I will not dismiss either of the federal claims, I wish to point out that the County Defendants appear to misapprehend the degree of discretion that the Court enjoys in determining

jurisdiction over them because they are not state actors. Lewis Mem. 7. But this too is a merits

argument, and I will address it below.[7]

Factual Issues

The Defendants assert that the Amended Complaint is factually deficient in several ways.

Before addressing the Defendants' legal arguments for dismissal, I will first determine whether

the Amended Complaint pleads facts from which I can "draw the reasonable inference" that the

Defendants are "liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

---

whether or not to exercise supplemental jurisdiction. As Plaintiffs correctly note, Pls.' Opp'n 22 n.15, a "district court[] *may* decline to exercise jurisdiction over a [state-law] claim" when it "dismisses all claims over which it has original jurisdiction," 28 U.S.C. § 1367(c)(3) (emphasis added). In other words, dismissal of related state-law claims is not mandatory when a court dismisses all of the federal claims in a complaint. And, as recognized by the Fourth Circuit, "trial courts enjoy wide latitude in determining whether or not to retain jurisdiction over state claims when all federal claims have been extinguished." *Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995). In exercising their discretion, courts consider "convenience and fairness to the parties, the existence of any underlying issues of federal policy, comity, and considerations of judicial economy." *Id.*

[7] As the Third Circuit has helpfully explained:

> [I]t is important to distinguish elements of a claim that relate to Congress's jurisdiction, i.e. its constitutional authority to act, from issues that relate to the jurisdiction of the courts. For example, . . . the state action requirement of a § 1983 claim constitutes a basis for Congress to regulate conduct pursuant to § 5 of the Fourteenth Amendment. Courts sometimes refer to [this] element as jurisdictional.
>
> But the jurisdictional concerns that a court has the power to resolve . . . pursuant to a Rule 12(b)(1) motion involve the court's jurisdiction. That jurisdiction is defined first by Article III of the Constitution, which enumerates the kinds of power that Congress may vest in the federal courts, and then by statutes, such as §§ 1331 and 1343, which actually vest a court with power. . . . Elements of a claim that are called jurisdictional because they relate to Congress's jurisdiction remain questions of the merits . . . .

*Kulick v. Pocono Downs Racing Ass'n, Inc.*, 816 F.2d 895, 898 (3d Cir. 1987) (citations omitted).

The Lewis Defendants maintain that they called the police not because Rivero and Evans were speaking with their workers but because they observed Evans urinating on their topsoil and standing near a shed that houses dangerous chemicals and because he and Rivero refused to produce identification. Lewis Mem. 10–11. Perhaps so, but that is the Lewises' version of the events, not what the Plaintiffs have alleged. The Plaintiffs allege that the Lewises confronted the Legal Aid staff while Rivero was seeking directions from the farm workers and that Linda Lewis "flew into a rage" upon learning that that Rivero and Evans worked for Legal Aid and promptly called the police. Am. Compl. ¶¶ 38–39. Thus, a factual dispute exists concerning the Lewises' reason for calling the police that cannot be resolved at the motion-to-dismiss stage, and I must accept the well-pleaded allegations that the Lewises called the police in order to prevent Rivero and Evans from speaking with the farmworkers.

The Lewis Defendants also argue that the Amended Complaint fails to allege that the Trespass Notifications issued by Officer Kettering prevented Rivero and Evans from conducting outreach at the migrant farmworkers' residences. Lewis Mem. 3, 8, 10–11. Specifically, they argue that the Trespass Notifications do not apply to the migrant farmworker residences at 18900 and 19101B Peach Tree Road because the address that appears on the Notifications is 19101 Peach Tree Road. Lewis Mem. 8. But the Amended Complaint explains that 19101 Peach Tree Road "does not seem to appear on Montgomery property plats or in property tax records" and that "the Lewises' property in the vicinity is contiguous and undifferentiated." Am. Compl. ¶¶ 34, 43. And since "[n]othing Kettering said suggested that the no-trespass order was limited to certain areas of Lewis Orchards property, or that Rivero and Evans were permitted to visit workers," they "reasonably interpreted" the Trespass Notifications "to apply to all activities on Lewis Orchards and related properties." *Id.* ¶ 43. Moreover, the Trespass Notifications

parenthetically describe the address at issue as "Lewis Orchards" in its entirety and specifically state that they were issued in response to "[u]nwanted distribut[ion] of literature," activity that only occurred at one of the two farmworker residences.  Rivero Trespass Notification Form; Evans Trespass Notification Form; Am. Compl. ¶ 44.  Based on these alleged facts and the information that appears on the Trespass Notifications, the Plaintiffs have successfully pleaded that they were legally barred from entering the farmworker residences at Lewis Orchards.

The County Defendants dispute that Officer Kettering had any knowledge that Rivero and Evans were attempting to contact the migrant farmworkers at their residences.  Cty. Reply 2–3.  According to them, the Amended Complaint contains no allegation that "Rivero ever communicated to Officer Kettering her specific desire to service the second group of migrant workers" or that Officer Kettering even knew that a second worker residence existed or that the workers there wanted to speak with the Legal Aid employees.  *Id.* at 3.  But the Amended Complaint states that after Officer Kettering initially asked Rivero and Evans to leave, they showed him a Virginia Attorney General Opinion discussing their right to visit migrant farmworkers housed on employer property and attempted to show him an analogous opinion from the Maryland Attorney General.  Am. Compl. ¶ 41.  From these factual allegations, it plausibly may be inferred that Officer Kettering gleaned that the Legal Aid employees' purpose in asserting their right to remain on the property was to interact with the migrant farmworkers housed there.

Finally, the Lewis Defendants contend that the Plaintiffs plead no facts that suggest that they will be prevented from visiting the farmworkers in the future.  Lewis Mem. 11.  But the Amended Complaint states that the Plaintiffs overheard Linda Lewis speaking to someone on the phone and instructing the listener to " 'call everybody' for a 'big meeting' " the following day.

Am. Compl. ¶ 46.  Moreover, the Plaintiffs allege that farmworkers were hesitant to speak with Rivero during follow-up calls.  *Id.* ¶¶ 48–50.  Based on these allegations, it is plausible to infer that the Lewises are chilling Legal Aid's organizing efforts by instructing their workers not to speak with the organization.

Accordingly, in determining whether the Plaintiffs claims may proceed, I must accept the well-pleaded facts that the Lewises called the police because Rivero and Evans were speaking with their workers; that Officer Kettering knew that Rivero and Evans were on the property to speak with migrant farmworkers; that the Trespass Notifications he issued prohibited them from doing so; and that the Lewises further undermined Legal Aid's efforts by instructing their workers to refrain from speaking to Legal Aid staff.

<u>Count I: Section 1983</u>

The County Defendants raise a number of defenses to the § 1983 claim against Officer Kettering.  First, they argue that Plaintiffs fail to state a claim because they have no First Amendment right to conduct outreach to migrant farmworkers.  Cty. Mem. 8–10.  And if such a right exists, they argue that qualified immunity shields Officer Kettering from liability under § 1983 for violating that right.  *Id.* at 10–12.  Finally, they argue that Plaintiffs cannot recover punitive damages from Officer Kettering because he did not act with actual malice.  Cty. Mem. 12–13.[8]

---

[8] Plaintiffs pleaded their § 1983 claim against Officer Kettering in both his official and individual capacities.  Am. Compl. ¶ 13.  The County Defendants argue in their Reply that Officer Kettering cannot be sued in his official capacity.  Cty. Reply 16–17.  They also raised this issue in a pre-motion letter setting forth the factual and legal bases for their Motion.  ECF No. 37.  They did not, however, raise the issue in the Memorandum in Support of their Motion to Dismiss.  I am inclined to agree with the County Defendants; however, "[t]he ordinary rule in federal courts is that an argument raised for the first time in a reply brief or memorandum will not be considered."  *Clawson v. FedEx Ground Package Sys., Inc.*, 451 F. Supp. 2d 731, 734 (D. Md. 2006).  Although the County Defendants raised the issue in the pre-motion letter, their

A. Plaintiffs' First Amendment Rights

Section 1983 provides a cause of action for damages or equitable relief to remedy "the deprivation of any rights, privileges or immunities secured by the Constitution and laws" by a "person" acting "under color" of state law. 42 U.S.C. § 1983; *Gomez v. Toledo*, 446 U.S. 635, 638 (1980). The County Defendants argue that the § 1983 claim fails because the First Amendment offers no protection for Legal Aid's outreach efforts to migrant farmworkers. Cty. Mem. 8–10. They attempt to bolster their argument by pointing out that Maryland's trespass statute, reinforced by a Maryland Attorney General Opinion on the topic, provides an exception that codifies migrant workers' right to *receive* persons providing lawful services without obtaining permission from the landlord, without recognizing a correlative right for providers to *offer* their services without property owners' permission. *Id.* at 8–9; *see also* Md. Code Ann., Crim. Law § 6-406(d)(2)(i) ("This section . . . does not . . . prevent a person who resides on cultivated land from receiving a person who seeks to provide a lawful service . . . ."); 67 Md. Op. Att'y Gen. 64 (1982).[9] Officer Kettering argues that Plaintiffs seek to "create a [F]irst Amendment right" to "interject [one]self into the dwellings of migrant workers." Cty. Mem. 8–9. As will be seen, this argument is too clever by half, because the right of migrant workers to receive lawful service without the corresponding right of providers to offer them is no right at all.

_____

failure to address it in their Memorandum deprived the Plaintiffs of an opportunity to be heard on the matter. I will therefore give the Plaintiffs fourteen days to submit a letter of no more than three pages setting forth their position and will rule on the issue after reviewing their submission.

[9] The Opinion provides in part: "We can perceive no legitimate business or security interest . . . that would justify denying the migrant workers the opportunity to receive aid and other services offered by governmental and private service agencies and organizations. **Therefore, representatives of these groups may enter the camps to seek out migrant workers who might benefit from their services, and they may remain on the premises as long as their services are needed or desired.**" 67 Md. Op. Att'y Gen. 64, 67 (1982) (emphasis added).

It appears to me that Md. Code Ann., Crim. Law § 6-406(d)(2)(i) and the Attorney General's Opinion accurately reflect service providers' clearly established First Amendment right, which I will expand upon shortly, to enter onto private property to speak with residents. To the extent that either the statute or the Opinion are articulated from the migrant farmworkers' perspective rather than the service providers', I would simply observe that when it comes to speech, it takes two to communicate. Migrant farmworkers' right to receive information, which the County Defendants acknowledge, would have little force if it did not also implicitly (or, as I read the statute and Opinion, explicitly) protect providers' right to contact the workers. Be that as it may, even if Md. Code Ann., Crim. Law § 6-406(d)(2)(i) and the Maryland Attorney General's Opinion were ambiguous as to service providers' right to disseminate information, speakers do not require an engraved invitation from the state to engage in First Amendment activity. Since 1925, the First Amendment's Free Speech Clause has applied directly to the states. *Gitlow v. New York*, 268 U.S. 652, 666 (1925). Accordingly, to the extent that Md. Code Ann., Crim. Law § 6-406(d)(2)(i) and the Maryland Attorney General's Opinion protect the free speech rights of migrant farmworkers or those who contact them, they either reiterate or expand federal rights. To the extent that they fall below the floor set by the First Amendment, they incompletely reflect Marylanders' rights.

What then is the scope of Legal Aid's First Amendment rights in this context? The Plaintiffs provide a fulsome, accurate, and largely unrebutted answer to that question. Pls.' Mem. 6–14. The First Amendment protects individuals' right "to impart information and opinions to citizens at their homes." *Schneider v. New Jersey*, 308 U.S. 147, 152 (1939). Jurisdictions may regulate such activity "in the interest of public safety, health, welfare or convenience," but not without "substantial[]" reason to do so, i.e. such regulation is reviewed

under the rubric of heightened or strict scrutiny. *Id.* at 150–51. In *Schneider*, the Court struck down several municipal ordinances that restricted the public distribution of literature, *id.* at 148–50, among them, Irvington, New Jersey's, which required individuals "canvass[ing], soclit[ing], distribut[ing] circulars, or other matter, or call[ing] from house to house" to secure a permit from the local police department, *id.* at 149. The Court found Irvington's ordinance particularly offensive because it "permit[ed] canvassing only subject to the power of a police officer to determine, as a censor, what literature may be distributed from house to house and who may distribute it," devolving the power to determine the scope of First Amendment protection to the "officer's judgment" and "discretion." *Id.* at 152. And the Court has repeatedly reaffirmed *Schneider*'s holding. *See Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Straton*, 536 U.S. 150, 168 (2002) (invalidating ordinance requiring individuals engaged in door-to-door advocacy to obtain a permit); *Hynes v. Mayor & City Counsel of Oradell*, 425 U.S. 610, 620 (1976) (invalidating ordinance requiring individuals conducting door-to-door canvassing or solicitation for charitable causes or political campaigns to provide written notice to local police department); *Murdock v. Pennsylvania*, 319 U.S. 105, 110–11 (1943) (invalidating ordinance that required individuals conducting door-to-door solicitation to pay a tax); *Martin v. City of Struthers*, 319 U.S. 141, 149 (1943) (invalidating ordinance prohibiting individuals distributing literature from ringing doorbells, sounding knockers, or summoning residents to the door); *cf. Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940) (invalidating on free-exercise grounds ordinance prohibiting individuals from engaging in religious, charitable, or philanthropic solicitation without determination by the Secretary of Public Welfare that the solicitation was for a bona fide charitable or philanthropic cause). And the First Amendment also protects legal

professionals' solicitation efforts. *In re Primus*, 436 U.S. 412, 426 (1978); *NAACP v. Button*, 371 U.S. 415, 429 (1963).

Parts of the County Defendants' response to the Plaintiffs' analysis are just plain silly. Much of their Reply is devoted to discussing the Supreme Court cases cited by the Plaintiffs, Cty. Reply 4–7, 11, and dismissing each as inapplicable because they "invalidated provisions of . . . statutes . . . [not] at issue in the instant case" and attempting to distinguish them because "Plaintiffs have not challenged the constitutionality of any statute, including the Maryland Cultivated Land Trespassing Statute," *id.* at 4–5. This is about as persuasive as arguing that the cases are distinguishable because different parties' names appear in the case caption. In any event, the County is simply wrong on this point. Plaintiffs *do* challenge the constitutionality of a statute: the Amended Complaint is an as-applied challenge to Maryland's criminal trespassing statute, which the Trespass Notifications cited as the basis for threatened prosecution. Rivero Trespass Notification Form; Evans Trespass Notification Form. Naturally, Plaintiffs have not brought a facial challenge to the trespassing statute—as the County Defendants appear to believe they must—because there are of course many constitutionally unassailable applications of that law. It is far from unusual for First Amendment claims to attack particular applications of otherwise constitutional laws.[10] *See, e.g.*, *Fed. Election Comm'n v. Wis. Right to Life, Inc.*, 551

_____

[10] Of course, a state or local official can infringe First Amendment rights without acting pursuant to a specific statute or regulation. For example, in *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, the Supreme Court held that school administrators violated students' First Amendment rights by prohibiting them from wearing black armbands in protest of the Vietnam War. 393 U.S. 503, 514 (1969). Moreover, Plaintiffs would still state a claim even if Officer Kettering had banished Rivero and Evans from Lewis Orchards without acting pursuant to *any* legal authority, as § 1983 also provides a remedy for deprivation of constitutional rights accomplished through a state official's "[m]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *See Monroe v. Pape*, 365 U.S. 167, 184 (1961) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)), *overruled on other grounds in Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658 (1978).

U.S. 449, 457 (2007) (as-applied challenge to Bipartisan Campaign Reform Act's ban on corporate funding of issue ads that name federal candidates aired shortly before primary and general elections); *Educ. Media Co. at Va. Tech, Inc. v. Insley*, 731 F.3d 291, 298 (4th Cir. 2013) (as-applied challenge to Virginia regulation that prohibited alcohol advertisements in college newspapers); *Tepeyac v. Montgomery Cty.*, 5 F. Supp. 3d 745, 753–54 (D. Md. 2014) (as-applied challenge to Montgomery County resolution requiring certain pregnancy centers to post signs disclosing lack of medical professionals on staff).

The County Defendants also argue that the Lewises had the right to speak for their workers by turning away Rivero and Evans. Cty. Def.'s Reply 7–13. They cite *Martin* for the proposition that "the individual master of each household" has the power to refuse door-to-door canvassers. 319 U.S. at 141. Additionally, they cite *Frisby v. Schultz*, which upheld an ordinance barring anti-abortion picketing outside of private residences on the principle that an "important aspect of residential privacy is protection of the unwilling listener." 487 U.S. 474, 484, 488–89 (1988). The County Defendants' argument might have some purchase if not for the provision of Maryland's trespass statute that it repeatedly cites in its briefing. Whether or not the Lewises can or should be considered the "master[s]" of their workers' homes, *Martin*, 319 U.S. at 141, Maryland law makes very clear that while an individual ordinarily cannot enter "cultivated land" without "permission from the owner," the law "does not . . . prevent a person who resides on cultivated land from receiving a person who seeks to provide a lawful service." Md. Code. Ann., Crim. Law. § 6-406(b), (d)(2)(i). Since subsection (d) of the provision is styled as an exception to subsection (b)'s requirement that individuals obtain the property owner's permission to enter cultivated land, the only reasonable interpretation of subsection (d) is that it

permits individuals providing lawful services to enter the property *without* the owner's permission in order to contact residents on the property.  Accordingly, the Lewises had no power to decide for their workers whether or not Rivero and Evans were welcome to knock on their doors.

I find that service providers such as Legal Aid have a First Amendment right to engage in door-to-door outreach until they are legitimately turned away by the property owners or residents and that Maryland law prohibits farm owners from turning away individuals attempting to speak with farmworkers housed on their property.

### B. Qualified Immunity

The County Defendants argue that qualified immunity shields Officer Kettering from liability.  Cty. Mem. 10–12.  Qualified immunity "protects law enforcement agents from federal claims when they act in objectively reasonable reliance on existing law."  *Queen v. Prince George's Cty.*, 188 F. Supp. 3d 535, 541 (D. Md. 2016) (quoting *Rockwell v. Mayor & City Council of Balt.*, No. RDB-13-3049, 2014 WL 949859, at *8 n.10 (D. Md. Mar. 11, 2014)).  It "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  "In particular, . . . qualified immunity protects law officers from 'bad guesses in gray areas' and it ensures that they may be held personally liable only 'for transgressing bright lines.' "  *Gomez v. Atkins*, 296 F.3d 253, 261 (4th Cir. 2002) (quoting *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992)).

Pursuant to this doctrine, police officers are not liable under § 1983 unless "(1) the allegations, if true, substantiate a violation of a federal statutory or constitutional right and (2)

the right was 'clearly established' such that a reasonable person would have known his acts or omissions violated that right." *Streater v. Wilson*, 565 F. App'x 208, 210 (4th Cir. 2014) (quoting *Brockington v. Boykins*, 637 F.3d 503, 506 (4th Cir. 2011) (internal citations omitted)). A right is clearly established when "the law 'has been authoritatively decided by the Supreme Court, the appropriate United States Court of Appeals, or the highest court of the state." ' In addition, a statute's plain language may also clearly establish the law's contours. *Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379, 399 (4th Cir. 2014). The Court may "exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236. The defendant carries the burden of proving qualified immunity. *McDonnell v. Hewitt-Angleberger*, No. WMN-11-3284, 2013 WL 4852308, at *3 (D. Md. Sept. 9, 2013) (quoting *Meyers v. Balt. Cty.*, 713 F.3d 723, 731 (4th Cir. 2013)).

As discussed above, Plaintiffs enjoy the right "to impart information and opinions to citizens at their homes," *Schneider*, 308 U.S. at 152, that permits their presence on private property until the "master of [the] household" requests that they leave, *Martin*, 319 U.S. at 141. Given the Supreme Court's serial invalidations of even trivial incursions on that right, it is also clearly established. But the case law does not clearly address *who* gets to turn away door-to-door canvassers or solicitors when multiple individuals exercise a degree of dominion over the property at issue. At first blush, Officer Kettering wrestled with this problem, as the Lewises owned the property on which their workers lived, but the farmworkers, not the Lewises, were the targets and intended beneficiaries of Legal Aid's speech and exercised dominion over their residences located on the property. But, in reality, Officer Kettering did not confront the "gray area[]" in federal law. *See Maciariello*, 973 F.2d at 298. This is because Maryland law clearly

resolved his dilemma by making clear that workers residing on farmland, not their employers, have the right to receive or refuse individuals providing lawful services such as Rivero and Evans, not their employers. Md. Code. Ann., Crim. Law. § 6-406(b), (d)(2)(i). Accordingly, qualified immunity does not bar the Plaintiffs' § 1983 claim against Officer Kettering.

C. Punitive Damages

The County Defendants also argue that, at the very least, Officer Kettering is not liable for punitive damages because he did not infringe the Plaintiffs' rights with actual malice. Cty. Mem. 12–13. But as Plaintiffs correctly note, Pls.' Opp'n 20–21, a plaintiff need not prove actual malice to obtain punitive damages in a § 1983 claim, *Smith v. Wade*, 461 U.S. 30, 51–55 (1983) (rejecting actual malice standard). Instead, a jury may elect to award punitive damages " 'to punish [the defendant] for his outrageous conduct and to deter him and others like him from similar conduct in the future,' . . . when the defendant's conduct . . . involves reckless or callous indifference to the federally protected rights of others." *Id.* at 54 (alteration in original) (quoting Restatement (Second) of Torts §908(1) (1977)). As *Smith* notes, a finding that qualified immunity does not shield an officer from liability also establishes that the officer has acted with reckless disregard for others' rights. *See id.* at 55. Moreover, the Amended Complaint alleges that Evans tried to show Officer Kettering a Maryland Attorney General Opinion that set forth the Plaintiffs' right to enter the property to conduct outreach to migrant farmworkers and that Officer Kettering refused to read the document. Am. Compl § 41. Plaintiffs have pleaded facts from which a reasonable jury could conclude that Officer Kettering acted with reckless disregard towards Rivero's and Evans's rights and elect to award punitive damages.

Article 40 of the Maryland Declaration of Rights provides that "every citizen of the State ought to be allowed to speak, write and publish his sentiments on all subjects, being responsible for abuse of that privilege." Md. Const. Decl. of Rts. art. 40. The Maryland Court of Appeals deems this right to be "co-extensive with . . . the First Amendment." *DiPino v. Davis*, 729 A.2d 354, 367 (Md. 1999). Accordingly, when a defendant violates the First Amendment, she also runs afoul of Article 40. Plaintiffs allege that Officer Kettering violated Article 40 and that Montgomery County is vicariously liable for his actions. Am. Compl. ¶¶ 63, 66. The County Defendants argue that the claim should be dismissed for failure to state cause of action. Cty. Mem. 16.[11]

Under Maryland law "a common law action for damages lies when an individual is deprived of his or her liberty in violation of the Maryland Constitution," *Okwa v. Harper*, 757 A.2d 118, 140 (Md. 2000), and Article 40 is among those rights protected by the state tort action, *see DiPino*, 729 A.2d at 373. "To prevail under any claim alleging violations of Maryland constitutional rights [against a police officer]. . . proof must be adduced: 1) [t]hat the defendant-officer engaged in activity that violated a right protected under the Maryland Constitution; and 2) [t]he defendant-officer engaged in such activity with actual malice towards the plaintiff." *Dehn Motor Sales, LLC v. Schultz*, 96 A.3d 221, 237 (Md. 2014) (citing Paul Mark Sandler & James K. Archibald, *Pleading Causes of Action in Maryland* 538 (5th ed. 2013); *see also Davis v. DiPino*, 637 A.2d 476, 479 (Md. Ct. Spec. App. 1994), *rev'd on other grounds*,

---

[11] The County Defendants also argue that the Plaintiffs failed to comply with the Local Government Tort Claims Act (LGTCA)'s notice requirements. *Id.* at 13–15. But those notice requirements only apply in actions for "unliquidated damages." Md. Code Ann., Cts. & Jud. Proc. § 5-304(b)(1). Since I hold that Plaintiffs may only pursue equitable relief through their state-law claim, I need not address the notice issue.

655 A.2d 401 (1995) (tying actual-malice pleading requirement for state constitutional claims against local officials to Md. Code Ann., Cts. & Jud. Proc § 5-507(a)(1) (then codified at *id.* § 5-321), which grants immunity to municipal officials "acting in a discretionary capacity, without malice, and within the scope of the official's employment").   The statutory subtitle under which § 5-507 resided until 1997, *see* 1997 Md. Laws ch. 14, at 386–87, defines "actual malice" as "ill will or improper motivation," Md. Code Ann., Cts. & Jud; *see also Owens-Illinois, Inc. v. Zenobia*, 601 A.2d 633, 652 (Md. 1992) (defining "actual malice" as conduct exhibiting "evil motive, intent to injure, ill will, or fraud").

Plaintiffs clearly allege that Officer Kettering violated their Article 40 rights, but the Amended Complaint is devoid of any facts from which ill will or an improper motive on his part can be inferred.  Accordingly, Plaintiffs cannot recover damages from Officer Kettering pursuant to the state law claim or from Montgomery County based on its vicarious liability.  But, to the extent that Plaintiffs seek equitable relief pursuant to the claim, it may proceed.

### Count III: Declaratory Judgment

Both the County and Lewis Defendants argue that the declaratory judgment count should be dismissed for failure to state a claim because the First Amendment does not protect Legal Aid's activity.  Lewis Mem. 9–10; Cty. Mem. 18.  For the same reasons that the Plaintiffs may pursue their § 1983 claim against Officer Kettering, they may also pursue declaratory relief against the County Defendants.  The Lewis Defendants also argue that the Plaintiffs may not pursue declaratory relief against them because they are not state actors and therefore could not have violated the Plaintiffs' First Amendment rights. [12]  Lewis Mem. 7.  Whether or not the

---

[12] By enacting the Declaratory Judgment Act "Congress enlarged the range of remedies available in federal courts but did not extend their jurisdiction." *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1970).  Thus, for a court to exercise federal-question jurisdiction in a

owners of migrant-farmworker camps can be state actors is an issue of first impression in the Fourth Circuit.

The Fourteenth Amendment's Due Process Clause prohibits states from "depriv[ing] any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. And, as previously noted, the Supreme Court has held that freedom of speech is one of the fundamental liberties that the Due Process Clause shields from state incursion. *Gitlow*, 268 U.S. at 666. But at the same time, "[i]ndividual invasion of individual rights is not the subject-matter of the [Fourteenth] [A]mendment." *Civil Rights Cases*, 109 U.S. 3, 11 (1883). As a result:

> until some State law has been passed, or some State action through its officers or agents has been taken, adverse to the rights of citizens sought to be protected by the Fourteenth Amendment, no legislation of the United States under said amendment, nor any proceeding under such legislation, can be called into activity, for the prohibitions of the amendment are against State laws and acts done under State authority.

*Id.* at 13. Plaintiffs seek declaratory relief to remedy an alleged deprivation of their First and Fourteenth Amendment rights. Thus, state action is a necessary component of the Plaintiffs' claim against the Lewises.

---

declaratory-judgment action, plaintiffs must identify a cause of action under which a federal question would arise "but for the availability of the declaratory judgment procedure." *Franchise Tax Bd v. Construction Laborers Vacation Tr.*, 463 U.S. 1, 16 (1983). The Lewis Defendants are only named in Count III of the Amended Complaint, which seeks declaratory relief. Am. Compl. ¶¶ 67–75. Count III alleges that the Lewis Defendants violated the Plaintiffs First Amendment rights, *id.* at 74, but does not identify a non-declaratory cause of action whereby Plaintiffs might vindicate their First Amendment rights. But the Lewis Defendants appear to understand the Plaintiffs' declaratory-judgment claim to speak to violations that could be vindicated by a § 1983 action. Accordingly, they argue that the claim should be dismissed because they are not state actors. Lewis Mem. 7. Since the Lewis Defendants understand the declaratory-judgment action to be premised upon a § 1983 action that the Plaintiffs could hypothetically bring against them and which would present a federal question, I will analyze whether or not the Lewis Defendants could possibly be considered state actors.

But the Supreme Court has recognized some exceptions to the general rule that private actors cannot infringe others' constitutional rights and has held that state action is present when a private entity exercises "power delegated to it by the State which is traditionally associated with sovereignty." *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 353 (1974). Based on this theory of state action, the Court overturned a trespassing conviction of a Jehovah's Witness who distributed literature in Chickasaw, Alabama—a suburb of Mobile owned by the Gulf Shipbuilding Corporation—in violation of the privately-owned town's non-solicitation policy. *Marsh v. Alabama*, 326 U.S. 501, 507–08 (1946). While recognizing that the company possessed the town as property, the Court explained that "[o]wnership does not always mean absolute dominion" and that "[t]he more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it." *Id.* at 506. Despite the town's privately-owned status, the Court observed that had title to the town "belonged not to a private but to a municipal corporation," the First Amendment would have protected the Jehovah's Wittiness's activity. *Id.* at 504. Accordingly, the town's ownership status put its residents' First Amendment rights in direct conflict with its owners' property rights. *Id.* at 509. But since the Alabama town had "all the characteristics of any other American town" whose residents "as all other citizens . . . must make decisions which affect the welfare of the community and nation," the Court determined that the residents' need for uncensored information trumped the owners' property rights. *Id.* at 502, 508–09.

For a short time, the Court also extended the *Marsh* rationale to shopping centers. In *Amalgamated Food Emp. Union Local 590 v. Logan Valley Plaza, Inc.*, the Court held that a shopping center could not prohibit a union from picketing outside a non-unionized grocery store

because a shopping center is "the functional equivalent of the business district" in *Marsh*. 391 U.S. 308, 318–20 (1968). Justice Black, who authored *Marsh*, dissented, arguing that *Marsh* addressed a "very special situation of a company-owned town, complete with streets, alleys, sewers, stores, residences, and everything else that goes into a town," whereas, aside from stores, a shopping center lacks the attributes of a town. *Id.* at 330–31 (Black, J., dissenting). In *Lloyd Corp. v. Tanner*, the Court held that a shopping mall could prohibit opponents of the Vietnam War from distributing handbills inside the mall, noting that shopping centers do not extend an "open-ended invitation to the public to use the [facilities] for any and all purposes" but rather "to do business with the [facility's] tenants." 407 U.S. at 564–65, 570. The Court therefore held that speech that is "directly related" to the property's purpose enjoys greater protection than unrelated speech. *Id.* at 564 (quoting *Logan Valley*, 391 U.S. at 320 n.9).[13] The Court also held that the balance between speakers' First Amendment rights and the private owners' property rights favors the owners where "adequate alternative avenues for communication exist." *Id.* at 567. Although *Lloyd* technically did not overturn *Logan Valley*, in *Hudgens*, the Court formally held that "the rationale of *Logan Valley* did not survive the Court's decision in the *Lloyd* case" because the Court's reasoning in the two cases could not be "squared." 424 U.S. at 518. Thus, in *Hudgens*'s wake, the First Amendment no longer applies to privately-owned shopping centers.

During and in the immediate aftermath of the doctrinal shifts between *Logan Valley* and *Hudgens*, several courts addressed the question of whether the First Amendment offers protection at migrant-farmworker camps. In *Petersen v. Talisman Sugar Corp.*, the Fifth Circuit likened a 1,000-person migrant-farmworker camp on the defendant's plantation to the company

---

[13] As the Court later hinted, this "directly related" prong of the *Lloyd* test had an odor of constitutionally suspect content-based regulation of speech. *Hudgens v. N.L.R.B*, 424 U.S. 507, 520 & n.8 (1976).

town in *Marsh*, noting that the camp "consisted of residential areas, streets, a store, eating facilities, a post office, and even a chapel."  478 F.2d 73, 82 (5th Cir. 1973).  The court also found that the farmworkers' nearly constant presence at the plantation denied the plaintiffs — labor and faith-based organizers—alternative options for communicating with the workers and that "[b]y using its property as a round-the-clock habitat for its employees, Talisman ha[d] forfeited the broad right which the owner of sawgrass and marshes alone would have to enforce strictly a 'No Trespassers' policy."  *Id.* at 82–83.  Because the defendant "located the functional equivalent of a thousand-resident municipality in the midst of its property," the court held that the company "must accommodate its property rights to the extent necessary to allow the free flow of ideas and information between the plaintiffs and the migrants," and accordingly allowed the plaintiffs to pursue their § 1983 claim against the private owner.  *Id.* at 78, 83.

A number of district courts reached the same conclusion but, in some instances, based on somewhat different lines of reasoning.  In *Mid-Hudson Legal Servs., Inc. v. G & U, Inc.*, which was decided after *Hudgens*, the Southern District of New York hued closely to the Fifth Circuit's reasoning, finding a camp to be the functional equivalent of a company town.  437 F. Supp. 60, 62 (S.D.N.Y. 1977) ("[W]here defendants have established a migrant community with the hallmarks of a 'company town', plaintiffs have a First Amendment right to enter that community at reasonable times for the purpose of discussing with its inhabitants the living or working conditions prevalent at the farm.").  Other courts during the *Logan Valley-Hudgens* interregnum applied First Amendment protections to migrant-farmworker camps without finding that the functional-equivalency test had been satisfied.  *Velez v. Amenta*, 370 F. Supp. 1250, 1255 (D. Conn. 1974) ("Whether or not Camp Windsor qualifies as a 'company town' within the criteria

established in *Marsh*, the Camp is not a family residence or a privately owned island located off the coast of Connecticut. It is the living quarters for hundreds of free citizens of the country and, therefore, the premises are more 'public' than 'private.' "); *Franceschina v. Morgan*, 346 F. Supp. 833, 838–39 (S.D. Ind. 1972) ("The Court believes that it begs the real issue to attempt comparison of company camps to company towns . . . . [T]he controlling status here is that the migrants are citizens of the United States, residing in their own homes, and are entitled to be treated as such. By the same token, their would-be visitors have the constitutional right to visit with them, subject to the discretion of the migrants and not of the company, its employees, and political auxiliary."); *Folgueras v. Hassle*, 331 F. Supp. 615, 623 (W.D. Mich. 1971) ("Joseph Hassle opened up portions of his property as the living areas for those working on his farm. . . . [O]wnership alone [cannot] give him the right to censor the associations, information and friendships of the migrants living in his camps. His rights of ownership of the land in question must bend to the countervailing rights of those persons rightfully living on the land.").[14]

Two Courts of Appeals have declined to extend First Amendment protections to migrant-farmworker camps. In *Asociacion de Trabajadores Agricolas de Puerto Rico v. Green Giant Co.*, a union sought to organize seasonal farmworkers on a farm operated by Green Giant. 518 F.2d 130, 123–32 (3d. Cir. 1975). Based on the *Lloyd* test, the Third Circuit held that the speech at issue was not protected because the plaintiffs in that case did not address what, if any, alternatives were available to the union to communicate with the laborers, leading the court to rule in Green Giant's favor. *Id.* at 140. But the court also indicated that First Amendment protections would extend to a similarly-situated farm where the employer "improperly . . .

---

[14] Although the farmworkers in *Velez*, 370 F. Supp. at 1251, and *Franceschina*, 346 F. Supp. at 834, were U.S. citizens, the First Amendment "acknowledges [no] distinction between citizens and resident aliens," *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 n.5 (1953).

isolate[s] [its] workers in an impenetrable fortress" and "mistreats its migrant laborers." *Id.* In *Ill. Migrant Council v. Campbell Soup Co.*, the Seventh Circuit interpreted *Hudgens* to prohibit extension of the *Marsh* doctrine to private property that is not "the functional equivalent" of a company town. 574 F.2d 374, 376 (7th Cir. 1978) ("It is the *Marsh* doctrine, unscathed by *Logan Valley* and *Lloyd*, and reaffirmed in *Hudgens*, that we will now apply."). Because nearby fire and police departments served the migrant residences in that case and because the workers frequently left the farm "to obtain goods and services typically obtainable in a small town," the court held that the camp was not functionally equivalent to a company town. *Id.* at 378.

It is clear from *Marsh* and from all of the cases that have addressed the applicability of the First Amendment to migrant-farmworker camps (regardless of the ultimate disposition), that state action is present where a camp is the functional equivalent of a company town. Thus, I have no doubt, despite the doctrinal gyrations between *Logan Valley* and *Hudgens*, that the First Amendment would apply to a camp like the one in *Petersen*, which had housing for more than 1,000 workers and a store, post office, and church, all connected by farm-owned streets. 478 F.2d at 82. Although the Amended Complaint discusses relatively few details about how Lewis Orchards maintains its migrant-farmworker residences or what services it provides to its workers, I suspect that the plaintiffs will have difficulty proving that the farm operates as something akin to a full-fledged company town (though, with further factual support, Plaintiffs may certainly so argue during summary-judgment practice or at trial). *Marsh* identified the key attributes of a town as "residential buildings, streets, a system of sewers, a sewage disposal plant and a 'business block'" and provision of emergency services. 326 U.S. at 502–03. Lewis Orchards houses only twelve workers in two residences. Am. Compl. ¶ 34. And the Amended

Complaint does not discuss any on-site store where farmworkers obtain provisions or any other services provided by the Lewises.

But, respectfully, I do not share the Seventh Circuit's certainty that *Hudgens* extinguished the applicability of the *Marsh* doctrine outside of the context of a functional equivalent of a company town. *Ill. Migrant Council*, 574 F.2d at 376. Although *Logan Valley* is no longer good law, it made an important observation about trespass law that neither *Lloyd* nor *Hudgens* refuted. In extending *Marsh* to shopping centers, the *Logan Valley* Court held that "the State may not delegate the power, through the use of its trespass laws, wholly to exclude those members of the public wishing to exercise their rights on the premises in a manner and for a purpose generally consonant with the use to which the property is actually put." 391 U.S. at 319–20. In other words, the Court identified the relevant state action in *Marsh* as not only Alabama's decision to permit a private company to operate a town but also its statutory empowerment of the company, through trespass law, to exclude unwanted individuals from its property. Because the shopping center in that case exercised delegated state power to exclude picketers from its premises, the Court confronted the same conflict between First Amendment rights and property rights that *Marsh* presented. In *Lloyd* and *Hudgens*, the Court rejected the notion that a shopping center's invitation to the public to conduct business on its property imposed upon it an affirmative obligation to provide a forum for First Amendment activity. But, as I read *Lloyd* and *Hudgens*, those cases do not foreclose the possibility that, in a different setting, a private entity's exercise of delegated state power by invocation of trespass law might sufficiently chill First Amendment rights such that recognition of state action would be justified, despite the relevant property lacking all of a company town's key attributes.

While the balance between First Amendment and property rights may not tip in favor of noncustomers utilizing commercial property as a forum for speech, it strikes me as far from unreasonable to suggest that the balance might work out differently when an owner invokes trespass law to isolate occupants of residential housing on his property from protected First Amendment activity. The Lewises do more than open their property to mere business invitees, as the shopping centers did in the *Logan Valley* line of cases; they employ and house lawful residents of the United States, who are entitled to unfettered exchange of information just as much as any other individual in a community. The issue raised by the migrant-farmworker camp is not whether farm owners must create a forum for speech, but whether farmworkers forfeit their constitutional rights by living on their employer's premises.

As the Court recognized in *Martin*:

For centuries it has been a common practice in this and other countries for persons not specifically invited to go from home to home and knock on doors or ring doorbells to communicate ideas to the occupants or to invite them to political, religious, or other kinds of public meetings. Whether such visiting shall be permitted has in general been deemed to depend upon the will of the individual master of each household, and not upon the determination of the community.

319 U.S. at 141. Although residential walkways and doorstoops are private property, First Amendment case law treats them as quasi-public vestibules leading to the public square. They are the capillaries in a larger vascular system through which speech flows; without them, public discourse would be starved of oxygen. If the migrant farmworkers on Lewis Orchards lived in offsite housing, the First Amendment indisputably would protect these channels of communication between them and the outside world, subject only to the workers' personal veto. A farm owner should not be able to wield his property rights through trespass law to completely suppress the exchange of ideas and information that might benefit the workers he houses and, potentially, the public as a whole.

That said, and as *Lloyd* and *Hudgens* make clear, the owners' property rights cannot be ignored in the act of judicial balancing. The gravest risk to farmworkers' rights exists where owners "isolate the[ir] workers in an impenetrable fortress," *Green Giant*, 518 F.2d at 140, or confine them to "a private island or an enclave existing without the full brea[d]th and vitality of federal constitutional and statutory protection," *Folgueras*, 331 F. Supp. at 621 (quoting Mich. Att'y Gen. Op. No. 4727, at 12 (Apr. 13, 1971)). Based on *Lloyd*, courts that have wrestled with this issue have held that migrant farmworkers' First Amendment rights must yield to the farm owner's property rights where "alternative avenues" of communication are available. *Green Giant*, 518 F.2d at 138; *Petersen*, 478 F.2d at 82. Where reasonable opportunities exist for speakers to effectively share information with farmworkers housed on farm property, even if door-to-door canvassing would be a superior method of communication, then the balance between migrant farmworkers' First Amendment rights and the farm owner's property rights favors the owner.[15]

Because I find that the Amended Complaint sufficiently pleads facts from which the potential for state action can be inferred, I will not dismiss the Lewis Defendants from the case. Going forward, Plaintiffs may prove that the Lewis Defendants are state actors either by providing evidence that Lewis Orchards operates as the functional equivalent of a company town

---

[15] It bears mentioning, that, as H-2A visaholders, the farmworkers at Lewis Orchards lead lives especially tethered to their employer. The H-2A program allows employers to petition the Secretary of Labor for permission to bring foreign workers to the United States to work in industries lacking "sufficient workers who are able, willing, and qualified" to perform needed labor and where importation of labor supply "will not adversely affect the wages and working conditions of workers in the United States." 8 U.S.C. § 1188(a)(1)(A)–(B). As a condition of sponsoring foreign workers, the employer must provide housing (onsite or elsewhere) to the workers, meals or cooking facilities, and transportation from and back to the workers' countries of origin. *Id.* § 1188(c)(4); 20 C.F.R. § 655.122(g), (h).

or by proving that they have no alternative avenues for reasonably effectively communicating their message to the migrant farmworkers housed at Lewis Orchards.

**<u>Conclusion</u>**

In sum, the Court possesses jurisdiction over this matter because the County Defendants' voluntary cessation of their allegedly illegal conduct does not moot the case and controversy alleged in the Amended Complaint and because Plaintiffs have pleaded a pattern of alleged constitutional violations that they appear likely to continue to encounter based on their continuous efforts to conduct outreach to migrant farmworkers and the Defendants' denial that the First Amendment has any application to the facts of this case. The Amended Complaint pleads facts from which it can be plausibly inferred that the Lewises summoned the police in order to prevent Rivero and Evans from contacting their employees; that the Trespassing Notifications issued by Officer Kettering barred Rivero and Evans from visiting migrant farmworkers at the Lewis Orchards residences; that Officer Kettering was aware that Rivero and Evans were on the property with the purpose of contacting migrant farmworkers; and that the Lewis Defendants have taken actions to prevent their employees from having contact with the Plaintiffs. Plaintiffs' § 1983 claim may proceed against Officer Kettering in his individual capacity because they have successfully pleaded that he violated their clearly established federal right to engage in door-to-door solicitation or canvassing. While Plaintiffs may pursue a state-constitutional tort in order to obtain injunctive relief, they may not pursue damages through that vehicle because they have not pleaded facts that suggest that Officer Kettering acted with actual malice. Finally, Plaintiffs may pursue declaratory relief against all of the Defendants because, based on the facts alleged in the Amended Complaint, I am persuaded that Plaintiffs should have an opportunity to demonstrate that the Lewis Defendants were state actors.

A separate Order follows.

Date: <u>May 2, 2017</u>                                   _____/S/_____

                                                          Paul W. Grimm
                                                          United States District Judge

jlb